UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Hallmark Building Supplies, Inc., <br><br> Plaintiff, <br><br> v. <br><br> MoistureShield, Inc. <br><br> Defendant. | Case No. 2:20-cv-191 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

### INTRODUCTION

1. Plaintiff Hallmark Building Supplies distributes commercial and residential building products. Defendant MoistureShield manufactures commercial and residential decking products. MoistureShield is a grandchild subsidiary of CRH Americas, which touts itself as "North America's largest building materials company." (https://www.crhamericas.com/(last viewed Feb. 3, 2020)).

2. Hallmark and MoistureShield entered into a distributor agreement that appointed Hallmark as an exclusive distributor in six states (including Wisconsin) and a non-exclusive distributor in three states. Under the parties' distributor agreement, Hallmark could become an exclusive distributor in the three non-exclusive states if it exceeded market-share expectations.

3. The parties performed under the distributor agreement. MoistureShield sold MoistureShield products to Hallmark for resale. Hallmark purchased its MoistureShield

product inventory from MoistureShield, created marketing materials and programs, and sold MoistureShield products throughout Hallmark's assigned territories.

4. After Hallmark had invested tens of thousands of dollars creating demand for MoistureShield products in its exclusive and non-exclusive territories, MoistureShield changed its business model by eliminating exclusive distributorships and mandating non-exclusive distributorships in all its territories. MoistureShield's business-model change had nothing to do with Hallmark's performance under the distributor agreement.

5. MoistureShield then terminated Hallmark's distributor agreement. Consistent with its change of business model, MoistureShield tapped another distributor to compete with Hallmark in certain of its exclusive states and foreclosed Hallmark's ability to become exclusive in the other three.

6. Because MoistureShield terminated the distributor agreement, Hallmark requested a repurchase of all MoistureShield inventory purchased under the distributor agreement that was unsold but remained at Hallmark's Waukesha, Wisconsin warehouse (the Inventory). MoistureShield hired an appraiser who determined the fair wholesale market value of the Inventory to be $615,497.

7. MoistureShield did not repurchase all the Inventory. MoistureShield instead repurchased just $232,043 of it. MoistureShield has failed and refused to repurchase the remaining $383,454 (the Remaining Inventory) or transfer the same to another dealer.

## THE PARTIES

8. Hallmark is a Wisconsin corporation with its principal place of business being at 901 Northview Road, Suite 100, Waukesha, Wisconsin 53188.

9. MoistureShield is a Delaware corporation with its principal place of business being at 914 North Jefferson Street, Springdale, Arkansas 72764.

## JURISDICTION AND VENUE

10. Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(1), because there is complete diversity between Hallmark and MoistureShield, and the amount in controversy exceeds $75,000, exclusive of interest and costs, as the wholesale fair market value of the Remaining Inventory is at least $383,454.

11. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2), (3), because a substantial part of the events and omissions giving rise to Hallmark's claims occurred in this district. Among other things, the Remaining Inventory at issue is being stored at Hallmark's Waukesha, Wisconsin warehouse, and MoistureShield is subject to this Court's personal jurisdiction.

12. Personal jurisdiction over MoistureShield is proper because MoistureShield, among other things: (1) entered into a distributor agreement with Hallmark (a Wisconsin corporation) granting Hallmark the exclusive right to sell MoistureShield products in Wisconsin; (2) shipped MoistureShield products to Hallmark's Wisconsin warehouse for resale under the distributor agreement; (3) hired an agent who traveled to Hallmark's Wisconsin warehouse to appraise the Inventory; (4) mailed a check to Hallmark's Wisconsin headquarters for a repurchase of some of the Inventory; and (5) sent several emails to Hallmark's attorney in Wisconsin promising to buy some of the Inventory.

# BACKGROUND FACTS

## A. Hallmark's business

13. Hallmark was founded in 1974 in Milwaukee, Wisconsin, by its current president and CEO Joe Balthazor. It has been doing business in Wisconsin for more than 45 years. It has offices and warehouses in Arizona, Colorado, Minnesota, Missouri, Nebraska, and Texas, but its headquarters office and warehouse are in Waukesha, Wisconsin.

14. Hallmark distributes a diverse line of building products that includes solid-surface and quartz materials, weatherization products, and cladding and decking systems.

15. Hallmark is not a typical distributor. It employs Dr. W. Edwards Deming's "System of Profound Knowledge" as a business strategy, focusing on providing high-quality services to its business partners. Hallmark has been repeatedly honored and recognized for its success in implementing Dr. Deming's teachings as a business strategy.

16. With more than 45 years' experience selling building products in Wisconsin and beyond, Hallmark has developed a body of industry knowledge and territory insight.

17. Using its unique business strategy, industry knowledge, and territory insight, Hallmark creates downstream demand for suppliers and reduces the cost of doing business for them. For example, Hallmark supports its suppliers with highly trained and educated customer service staff, joint marketing campaigns, and educational programs.

18. Hallmark also employs highly trained and experienced sales and marketing teams. Drawing from Hallmark's breadth and depth of experience in the building industry, these teams work together with manufacturers to identify growth areas within a territory,

create demand for products in those areas, and develop marketing programs to maximize sales.

19. Because of the time, money, and effort that goes into creating downstream demand, Hallmark does not typically partner with manufacturers to be a distributor unless Hallmark is the exclusive distributor in each sales territory. Hallmark does not benefit from being a non-exclusive distributor because, in those instances, it does not realize the full return on its investment in creating downstream demand. Sometimes, Hallmark enters into distributor agreements under which it begins as a non-exclusive distributor but only if it has the ability to become exclusive under the terms of the distributor agreement.

**B.** **MoistureShield's business**

20. MoistureShield manufactures composite decking products for sale in residential and commercial markets. It is a subsidiary of Oldcastle APG (Oldcastle), which is itself a subsidiary of CRH Americas.

21. Originally, Advanced Environmental Recycling Technologies Inc. (AERT) sold composite decking products under the brand name MoistureShield. In March 2017, Oldcastle acquired AERT and the MoistureShield brand name. In May 2019, Oldcastle reformed its decking business division and changed the name of it to MoistureShield.

**C.** **Hallmark and MoistureShield form a distributor agreement**

22. On or around July 25, 2017, after hearing "great things" about Hallmark from a different company, MoistureShield contacted Hallmark by email to talk about "partnering with Hallmark to distribute MoistureShield."

23. Hallmark, in response, expressed an interest in partnering with MoistureShield, so the parties started arranging a time to meet over the phone.

24. During August and September 2017, the parties participated in a few introductory phone calls and meetings, and MoistureShield shipped product samples to Hallmark's Minneapolis office and its headquarters office in Waukesha.

25. In October 2017, at the Deck Expo in Nashville, Tennessee, the parties moved forward and began negotiating the terms of a distributor agreement under which Hallmark would market and sell MoistureShield products in defined geographic territories. During negotiations, Hallmark thoroughly explained to MoistureShield, over the phone and in person, how Hallmark creates downstream demand and, for that reason, why it prefers being an exclusive distributor.

26. On November 13, 2017, Hallmark's executive vice president and vice president of sales operations Robb Buechler emailed MoistureShield's eastern regional sales manager Moss Pettigrew asking him to "confirm in writing the territory, where [Hallmark] would have exclusive vs. dual distribution, what companies would no longer have access to the products, and outline of the plan forward for more exclusivity if [Hallmark] exceed[s] [MoistureShield's] expectations." (Exhibit A).

27. The same day, Mr. Pettigrew responded saying that MoistureShield was "ready to move forward" and that MoistureShield was in the process of "finalizing all of the details." The next day, on November 14, 2017, Mr. Pettigrew emailed Hallmark the finalized terms of the proposed distributor agreement:

6

We are ready to move forward. If we agree to move forward, we will terminate our partnership with our current distributor in Madison, Wisconsin.

This will give you exclusivity in: Wisconsin, Illinois, Minnesota, North Dakota, South Dakota, and Nebraska.

Dual distribution in: Iowa, Kansas, and Missouri.

We can look at more exclusivity if market share expectations are exceeded.

If in agreement, [MoistureShield] will give exclusivity to the above six states (WI, MN, ND, SD, NE) and dual distribution to the above three states (IA, KS, MO) if Hallmark discontinues distribution of [another product] in those states.

Attached are the Storage and Handling instructions, Program details, Rebate Programs, Co-op plan, and Sales Presentation.

Here is the suggested initial stock order:

IL-
[. . .]
GRAND TOTAL- $188,356.43

MO-
[. . .]
GRAND TOTAL- $188,356.43

MN-
[. . .]
GRAND TOTAL- $188,356.43

TOTAL ALL LOCATIONS- $565,069.29
[. . .]

Please let me know if you have any questions. We are looking forward to working with you!

(Exhibit A).

28. Under the terms of the proposed distributor agreement, Hallmark understood that it would be exclusive in six states (including Wisconsin) and non-exclusive in three

states. Critically, Hallmark also understood that the non-exclusive states could become exclusive if Hallmark exceeded market-share expectations.

29. In December 2017, Mr. Pettigrew and MoistureShield's vice president of sales and marketing Brent Gwatney traveled to Waukesha, Wisconsin, to meet with six Hallmark officers and employees, including its CEO and president Joe Balthazor and its vice president of marketing Katie Sadorf. During the meeting, Hallmark and MoistureShield agreed to the terms of the distributor agreement, as set forth in the above-referenced November 13-14, 2017 email correspondence.

30. On December 7, 2017, Mr. Pettigrew emailed Hallmark "following up" on the in-person meeting in Waukesha, Wisconsin. MoistureShield confirmed that it was "very excited to move forward." To keep things moving, MoistureShield attached a credit application and requested the contact information for those who attended the meeting.

31. On January 18, 2018, MoistureShield emailed Hallmark explaining the process for ordering initial inventory. MoistureShield attached the pricing lists for all MoistureShield products that would be sold under the distributor agreement and a "2018 Program" that included information on "front-loaded co-op marketing funds"; discounts for "initial stock order[s]"; payment terms ("Net 30"); and rebalance procedures ("Hallmark and [MoistureShield] will trade inventory dollar for dollar in full units only, after the first season. Hallmark and [MoistureShield] will split the freight. (Hallmark pays one way, [MoistureShield] pays the other").

**D. The parties perform under the distributor agreement**

32. Following MoistureShield's guidance on initial-inventory orders, Hallmark submitted three purchase orders for more than $600,000 in initial MoistureShield inventory—on February 27, 2018; March 1, 2018; and March 8, 2018. For each purchase order, MoistureShield billed Hallmark at the following address:

> Hallmark Building Supplies, Inc.
> 901 Northview Road
> Suite 100
> Waukesha WI 53188

33. Hallmark stored the above-ordered inventory across three of its warehouses (Waukesha, Wisconsin; Minneapolis, Minnesota; and St. Louis, Missouri).

34. Even though Hallmark stores inventory outside Wisconsin, a significant amount of that inventory is ultimately sold to Wisconsin businesses because, logistically speaking, it is closer to ship inventory from Minneapolis, Minnesota, to northern and western Wisconsin. Hallmark also transfers a significant amount of inventory from its Minnesota and Missouri warehouses to its Wisconsin warehouse to fulfill orders for Wisconsin businesses. And sales, regardless of where the inventory originates, flow to the Wisconsin headquarters.

35. In 2018, MoistureShield terminated its distributor relationship with a different Wisconsin distributor (giving Hallmark exclusivity) and asked Hallmark if it would take that distributor's remaining inventory. Hallmark agreed to do so.

36. Hallmark invested six-figure dollars to create downstream demand for MoistureShield products. That investment included, for example, Hallmark training

MoistureShield's customers, developing and executing marketing programs, identifying and preparing for at least 50 trade shows, and initiating leads with more than 45 dealers.

**E.     MoistureShield abruptly cancels distributor agreement**

37. On or around May 13, 2019, Oldcastle APG changed the name of its decking products division to MoistureShield and reformed MoistureShield's business model.

38. Three days later, MoistureShield cancelled the distributor agreement.

39. During a May 16, 2019 meeting between Hallmark and MoistureShield executives, MoistureShield informed Hallmark that it had eliminated Hallmark's exclusivity in all six states and foreclosed its ability to become exclusive in any other state, regardless of Hallmark's sales performances. MoistureShield also advised that it was appointing another distributor to compete with Hallmark in certain territories.

40. On May 21, 2019, MoistureShield's vice president of sales Todd Braun emailed Hallmark offering a new, non-exclusive distributor agreement under which Hallmark and another distributor would co-distribute MoistureShield products in defined territories. He indicated that MoistureShield remained interested because it "value[d] the Hallmark partnership" but nevertheless confirmed that it "recognize[d] [Hallmark's] organizational strategy & rationale for geography participation."

41. Hallmark declined MoistureShield's offer for the new, non-exclusive distributor agreement but continued, with MoistureShield's permission, fulfilling orders for projects that were already in process when MoistureShield cancelled the distributor agreement on May 16, 2019.

42. On June 3, 2019, Hallmark's regional sales manager emailed Mr. Braun saying: "Todd, there are customers of ours that are supplying material for either builders or manufacturers of some sort and **with us no longer distributing your product** they are going to need someone in the near future to purchase from. Do you have a company, name and contact info that I can pass along?"

43. Mr. Braun responded, providing contact information for a MoistureShield employee and advising that she would be "the transition point."

**F.     Hallmark requests an inventory repurchase**

44. Mr. Buechler emailed Mr. Braun on June 4, 2019, requesting that MoistureShield help transfer the Inventory back to MoistureShield or to another MoistureShield dealer willing to take it.

45. Mr. Braun responded the next day saying: "Fully agree. Are you able to forward over your current inventory for review?"

46. On June 6, 2019, after Hallmark sent the inventory list, MoistureShield told Hallmark that it would go "through the inventory list for all 3 locations so that it can attempt to purchase any of the materials identified by Hallmark and transfer the same to another vendor."

47. On June 10, 12, and 13, 2019, MoistureShield's "transition point" person sent a MoistureShield representative to three of Hallmark's warehouses (Wisconsin, Minnesota, and Missouri) to inspect the Inventory. The representative found the Inventory in very good condition and determined it acceptable for return or resale.

48. During a June 18, 2019 conference call, MoistureShield advised Hallmark that it would not repurchase the Inventory or help in any way to move it to another dealer.

49. On June 24, 2019, Hallmark's attorney sent a letter requesting that MoistureShield repurchase the Inventory.

**G.  MoistureShield agrees to repurchase "Wisconsin inventory"**

50. In response, MoistureShield agreed to repurchase the inventory being stored at Hallmark's Wisconsin warehouse but said it did not believe it needed to repurchase the inventory located in Minnesota and Missouri. Nevertheless, MoistureShield assured Hallmark that it was "attempting to locate a purchaser for that [Minnesota and Missouri] inventory."

51. When MoistureShield had previously cancelled its distributor agreement with the other Wisconsin distributor in 2018, MoistureShield transferred that distributor's remaining inventory to another distributor (*i.e.*, Hallmark). Therefore, when MoistureShield cancelled its distributor agreement with Hallmark, Hallmark understood that MoistureShield would do the same or provide another acceptable solution, like repurchasing the Remaining Inventory.

52. At the time MoistureShield agreed to repurchase the "Wisconsin inventory," all of the Inventory, including that from Missouri and Minnesota, was being stored at Hallmark's Wisconsin warehouse as part of the wind-down process.

53. In August 2019, MoistureShield retained an appraiser to determine the wholesale fair market value of the Inventory. The appraiser determined that the wholesale fair market value of the Inventory was $615,497. (Exhibit B).

54. On September 24, 2019, MoistureShield agreed to send a $232,043 check for what it called the "Wisconsin inventory." When Hallmark asked why MoistureShield would not repurchase all of the Inventory, as requested, MoistureShield explained that some of the Inventory had been stored in Hallmark's Minnesota and Missouri warehouses for a period of time, and for that reason, MoistureShield was not obligated to repurchase it. Although MoistureShield said it was not obligated to do so, it told Hallmark that it was "seeking a buyer for the inventory from Missouri and Minnesota."

55. Relying on MoistureShield's statements and prior dealings, Hallmark understood that MoistureShield would either repurchase all of the Inventory or transfer the same to another dealer.

56. On September 30, 2019, Hallmark received a check for $232,043, again representing what MoistureShield had called the "Wisconsin inventory."

57. On November 5, 2019, Hallmark sent a second letter requesting that MoistureShield repurchase all Inventory (*i.e.*, the Remaining Inventory having a wholesale fair market value of $383,454), or find a buyer to whom Hallmark could transfer it. Hallmark followed up by email on November 18, 2019.

58. Hallmark has tried to sell the Remaining Inventory, but it has been unable to do so. To date, MoistureShield has not repurchased all inventory sold to Hallmark for resale under the distributor agreement—*i.e.*, the Remaining Inventory.

# CAUSES OF ACTION

## Count One
## (Wisconsin Fair Dealership Law)

59. Hallmark incorporates all the preceding paragraphs.

60. The WFDL, which is "liberally construed and applied to promote its underlying remedial purposes and policies," Wis. Stat. § 135.025(1), governs Hallmark and MoistureShield's relationship because Hallmark is located in Wisconsin and sells goods and services here.

61. Under the WFDL, Hallmark is a "dealer" because MoistureShield granted Hallmark a dealership situated in Wisconsin, and MoistureShield is a "grantor" because it granted a dealership to Hallmark in Wisconsin. Wis. Stat. §§ 135.02(2), (5).

62. The distributor agreement is a "dealership" under the WFDL because: (1) it is an agreement between Hallmark and MoistureShield; (2) it grants Hallmark the exclusive right to sell MoistureShield decking products and use MoistureShield's marketing materials in Wisconsin; and (3) Hallmark and MoistureShield share a community of interest, as there is a continuing financial interest in both the dealership and the offering and selling of MoistureShield decking products. Wis. Stat. § 135.02(3)(a).

63. The dealership is situated in Wisconsin because, among other things: (1) at least 45% of Hallmark's total MoistureShield sales derived from Wisconsin; (2) the parties have been dealing with each other for more than two years in Wisconsin; (3) ) MoistureShield imposed sales expectations on Hallmark for the Wisconsin territory; (4) MoistureShield gave Hallmark the right to be the exclusive MoistureShield distributor

in Wisconsin; (5) MoistureShield granted Hallmark the right to use MoistureShield's name and associated marks on any marketing materials distributed in Wisconsin; (6) Hallmark invested more than six figures into the dealership in Wisconsin, including creating marketing materials, developing promotional programs, and training downstream customers on how to use and install MoistureShield products; (7) Hallmark devoted at least three highly trained sales people to the Wisconsin market; (8) Hallmark spent approximately $10,000 on marketing MoistureShield products in Wisconsin; and (9) Hallmark hosted training and educational classes for MoistureShield customers in Waukesha, Wisconsin.

64. Under the WFDL, a grantor cannot cancel or substantially change the competitive circumstances of a dealership agreement unless it has "good cause" to do so. Wis. Stat. § 135.03.

65. "Good cause" means a "[f]ailure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor." Wis. Stat. § 135.02(4)(a).

66. The grantor has the burden of proving good cause. Wis. Stat. § 135.03.

67. Under the terms of the distributor agreement, Hallmark had exclusivity in Wisconsin and five other states and the prospect of becoming exclusive in three others.

68. MoistureShield cancelled or substantially changed the competitive circumstances of the dealership agreement by terminating Hallmark's exclusivity in certain of the states, foreclosing its right to earn exclusivity in the other three, and contracting with another distributor to compete with Hallmark for MoistureShield sales.

15

69. MoistureShield did not have good cause to cancel the dealership agreement or substantially change the competitive circumstances of it because MoistureShield's decision to eliminate exclusive distributor relationships and move to non-exclusive distributor relationships had nothing to do with Hallmark. Hallmark complied with (and even exceeded) the essential and reasonable requirements imposed by MoistureShield under the dealership agreement.

70. Under the WFDL, if a grantor cancels a dealership agreement without cause, like MoistureShield did here, "the grantor, at the option of the dealer, *shall* repurchase *all* inventories sold by the grantor to the dealer for resale under the dealership agreement at the fair wholesale market value." Wis. Stat. § 135.045 (emphasis added).

71. After MoistureShield cancelled the distributor agreement, Hallmark requested that MoistureShield repurchase all of the Inventory. In other words, Hallmark requested that MoistureShield "repurchase all inventories sold by [MoistureShield] to [Hallmark] for resale under the dealership agreement at the fair wholesale market value." Wis. Stat. § 135.045.

72. MoistureShield hired an appraiser who determined that the wholesale fair market value of all of the Inventory was $615,497.

73. MoistureShield repurchased only some of the Inventory for $232,043. It has failed or refused to repurchase the Remaining Inventory for its wholesale fair market value of $383,454.

74. Because MoistureShield terminated the dealership agreement and Hallmark requested a repurchase of all the Inventory, MoistureShield's failure and refusal to

16

"repurchase *all* inventories sold by [MoistureShield] to [Hallmark] for resale under the dealership agreement at the fair wholesale market value" constitutes a violation of the WFDL. Wis. Stat. § 135.045.

75. The WFDL authorizes a dealer, such as Hallmark, to seek "damages sustained by the dealer as a consequence of the grantor's violation[s], together with actual costs of the action, including reasonable actual attorney fees . . . ." Wis. Stat. § 135.06.

76. As a direct and proximate cause of MoistureShield's violations of the WFDL, Hallmark has incurred, and will continue to incur, damages that will be fully demonstrated at trial, plus Hallmark's costs and attorneys' fees.

### Count Two
### (Breach of Distributor Agreement)

77. Hallmark incorporates all the preceding paragraphs.

78. Hallmark and MoistureShield entered into the distributor agreement.

79. The distributor agreement is a valid and binding contract.

80. Hallmark has performed all of its obligations under the distributor agreement.

81. A material term of the distributor agreement provided Hallmark exclusivity in Wisconsin and five other states and the prospect of becoming exclusive in three others.

82. MoistureShield materially breached the dealership agreement by, among other things, terminating Hallmark's exclusivity in six states (including Wisconsin), foreclosing its right to earn exclusivity in the other three, and contracting with another distributor to compete with Hallmark for MoistureShield sales.

83. As a direct and proximate cause of MoistureShield's breach of the distributorship agreement, Hallmark has incurred damages in an amount to be proven at trial, plus pre- and post-judgment interest as provided for by law.

## JURY TRIAL DEMAND

84. Hallmark demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Hallmark respectfully requests the following relief:

1. For Count One: entry of judgment in favor of Hallmark and against MoistureShield for (a) an order requiring MoistureShield to repurchase the Remaining Inventory; (b) an award in an amount equal to Hallmark's direct, incidental and consequential damages under the WFDL; and (c) an award in the amount of Hallmark's costs, disbursements, and reasonable attorneys' fees, to the extent authorized under the WFDL and any other applicable law;

2. For Count Two: entry of judgment in favor of Hallmark and against MoistureShield for damages resulting from MoistureShield's breach of the distributorship agreement; and

3. Such other and further relief in favor of Hallmark and/or against MoistureShield as the Court deems just and equitable.

Dated: February 7, 2020

*s/Jason R. Asmus*
Jason R. Asmus, WI#1096120
O. Joseph Balthazor Jr., MN#399093 (*pro hac vice* to be filed)
Attorneys for Plaintiff Hallmark Building Supplies, Inc.
Taft Stettinius & Hollister LLP
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 977-8400
Fax: (612) 977-8650
Email: jasmus@taftlaw.com
Email: jbalthazor@taftlaw.com

12229726v9